IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| VICKY L. WEBER, | ) | |
| | ) | 4:10CV3229 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | MEMORANDUM AND ORDER |
| | ) | |
| SOCIAL SECURITY ADMINISTRATION, | ) | |
| Michael J. Astrue, Commissioner, | ) | |
| | ) | |
| Defendant. | ) | |

This matter is before the court on the plaintiff's appeal of a final decision of the Commissioner of the Social Security Administration denying her application for disability benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401 *et seq*. This court has jurisdiction under 42 U.S.C. § 405(g). The Commissioner has filed a transcript of the record of proceedings. Filing No. 7, Attachments 1 - 6 ("Admin. R. I"); Filing No. 8, Attachments 1-7 ("Admin. R. II").[1]

The plaintiff filed her application for disability benefits on April 3, 2008, alleging that she became disabled on August 1, 2005, as the result of a "seizure disorder, migraines, Von Willebrand bleeding disorder,[2] arthritis, painful joints, and carpal tunnel surgery in 2007." *See* Filing No. 7, Admin. R. I at 178. Her claim was denied initially and on review. *Id.* at 76-80. She requested a hearing and appeared at a video hearing before an Administrative Law Judge ("ALJ") on June 2, 2009. *Id.* at 80, 101. The ALJ denied the

---

[1]The electronically-filed administrative record is numbered sequentially on the bottom right corner of each page. The court's citation to the record will be to those pages. The page numbers correspond to the PDF numbers on the documents.

[2]Von Willebrand disease is a blood abnormality involving clotting. Stedman's Medical Dictionary (27th ed. 2000), available at STEDMANS 12290 (Westlaw).

plaintiff's claim.   *Id.* at 8-19.   The ALJ's decision became the final decision of the Commissioner on September 23, 2010, when the Appeals Council denied plaintiff's request for review.   *Id.* at 1-3.

## I.  BACKGROUND

### A.  Facts

On June 2, 2009, the plaintiff appeared with counsel and testified at a video hearing before an ALJ.  Filing No. 7, Admin. R. I at 27.  She was asked about her health, limitation and activities prior to September 30, 2007, and her testimony relates to that period of time.[3] *Id.* at 33.  The plaintiff was born on April 7, 1964, and was 43 years old on September 30, 2007, the date she was last insured.  *Id.* at 31.  She has a past relevant work history as a manager at a retail store, a cashier, child care worker, and a short order cook.  *Id.* at 20-30. She has a high school education.  *Id.* at 32.  She testified that she is 5'2" tall and weighs 282 pounds.  *Id.* at 33.  She is married.  *Id.* at 31.  She testified that she smokes about three-fourths of a pack of cigarettes a day. *Id.* at 36.

 The plaintiff discussed her daily routine, including her ability to perform household chores and activities.  *Id.* at 37.  The plaintiff stated she could drive a car but only if she "was feeling okay."  *Id.* at 35.  She testified that she could perform typical household chores, including laundry, cleaning, and occasional grocery shopping.  *Id.* at 36-37.  She testified that although she made lunch and dinner for herself and her husband, she would need a nap after cleaning the dishes.  *Id.* at 37.  She further testified that she had to cook

---

[3]The relevant period in this case is limited by the expiration of the plaintiff's insured status on September 30, 2007.  20 C.F.R. § 404.130.  The plaintiff must establish she was disabled prior to the expiration of her insured status. *Long v. Chater*, 108 F.3d 185, 187 (8th Cir. 1997).

meals while sitting down, had to take periodic breaks while she was vacuuming, and slept on a recliner-chair because she was unable to walk upstairs to her bedroom. *Id.* at 40, 49. She testified she did no yard work and rarely exercised because it was too difficult with the pain in her knee. *Id.* at 40.  The plaintiff stated she could sit down for roughly an hour, that she could stand for roughly ten minutes, and that she could walk fifty feet without assistance. *Id.* at 41-42.  She estimated she could safely lift ten pounds and carry that weight for 25 feet, but  she later qualified her estimation, stating she could do so only on a limited basis and not on a repetitive basis. *Id.* at 41, 54.

She stated she began to experience numbness in her fingers in June of 2006. *Id.* at 44.  Also, she testified that she would often lose her grip on various items, including door knobs, and would drop things due to numbness and/or cramping in her hands. *Id.* at 42, 54-55.  Further, she stated that she could not fasten buttons on shirts or tie her shoes. *Id.* at 42, 38.  She also discussed difficulty raising her arms above her head and maintaining her balance. *Id.* at 43.  She testified that she continues to suffer from pain and numbness in her hands. *Id.* at 45.

The plaintiff testified that she sustained a pressure fracture in her left knee in August 2007. *Id.* at 48.  She stated she has significant arthritis in her right knee and injured her left knee in August 2007. *Id.* at 47.  She stated she had considerable difficulty standing and walking prior to that date as a result of arthritis and pain in her knees and back. *Id.* She further testified that her lower back "just killed [her] all the time" and she couldn't stand for more than 10 minutes. *Id.* at 54.

She also discussed her difficulty sleeping and resulting persistent daytime sleepiness. *Id.* at 49-50.  She testified she usually went to bed at around 10:00 at night

and woke up around 5:00 in the morning, but would only sleep for about four to five hours during that time.  *Id.* at 49.  She was diagnosed with sleep apnea in 2008, but testified that her difficulties sleeping began prior to that date.  *Id.*

Ms. Weber also testified about her seizures and migraine headaches. *Id.* at 52. Prior to September 2007, she had experienced two grand mal seizures and had petit mal seizures twice a week.  *Id.* at 50.  She testified she was bothered by flashing lights and computer screens.  *Id.* at 51.  She testified she has experienced migraines in increasing severity since she was 9 or 10 years old.  *Id.*  She estimated she had at least two severe migraines per week in the year preceding September of 2007.  *Id.* at 52.  The headaches would last for an hour to an hour and a half and would force her to lie down.  *Id.* at 52, 55. She testified she would take pain pills, lie down in a dark room and put cold rags on her head for the migraines.  *Id.* at 52.  She stated, however, that she cannot take many pain pills because they cause thinning of the blood and she has a blood disorder.  *Id.* at 45. She also testified that heat, cold, dampness, humidity, noise, and vibrations affected her conditions.  *Id.* at 35.

Further, she stated that she has a large ventral hernia that will now require surgery.[4] *Id.* at 52.  She stated she had it before September 30, 2007, and that at that time it would prevent her from bending over.  *Id.* at 53.  It was the size of a basketball at the time of the hearing.  *Id.*

---

[4]A hernia is protrusion of a part or structure through the tissues normally containing it.  Stedman's Medical Dictionary (27th ed. 2000), available at STEDMANS 179860 (Westlaw).  A ventral hernia is an abdominal incisional hernia.  *Id.*

A clinical psychologist, Dr. Nancy Winfrey testified as a medical expert at the hearing. *Id.* at 29-30. She stated that her review of the plaintiff's medical record showed the plaintiff had no mental impairments. *Id.* at 30.

A vocational expert, Dr. William Tysdal, also testified at the hearing. *Id.* at 30-59. He was asked whether a claimant with disabilities similar to Ms. Weber's could perform any of her past relevant work.[5] *Id.* at 57. He replied that such a worker could not perform any of Weber's past work, but that "there would be sedentary work that individual could perform." *Id.* at 57. He listed the positions of an order clerk or call-out operator as examples of jobs that exist in substantial numbers in the national or regional economy that the hypothetical worker could perform. *Id.* at 58. The vocational expert was asked also what jobs would be available for a hypothetical worker with lifting and carrying limitations at the light, rather than the sedentary, exertional level. *Id.* at 58. The vocational expert added the position of "survey worker," which is unskilled, to the list of jobs that the hypothetical person could perform. *Id.*

---

[5]Specifically, the vocational expert was asked to assume "the existence of a hypothetical worker of the claimant's age, education, and past work experience" who was

> limited, in terms of lifting and carrying, to the sedentary level. Could stand and/or walk for about two hours in an eight-hour day with normal breaks. And sit for at least six hours in an eight-hour day with normal breaks. Pulling pushing or pulling at the same level as lift and carry. They could only occasionally have to go up or down stairs or steps. Never ladders, ropes, or scaffolds. They should only occasionally balance, stoop, kneel, crouch, or crawl. Is limited to frequently reaching overhead. And frequently engaging in either gross or fine manipulation or handling and fingering, however you want to interpret that. And they need to work where they're not subjected to concentrated exposure to extreme heat, extreme cold, dampness or humidity, noise or vibration. And no exposure to hazards in the workplace, like ladders, ropes, scaffolds, things like that, . . . .

*Id.* at 57.

The vocational expert also testified that if the hypothetical person had numbness, lack of feeling and tingling in both hands in addition to the above-listed limitations, only the call-out operator job would be available.  *Id.* at 60.  He stated that if the hypothetical worker suffered from seizures and/or migraine headaches of a frequency of two to three times per week to the extent the worker needed to lie down in a dark room, "it would preclude those jobs that [he had] identified or . . . any other work in the national or regional economy."  *Id.* at 61.  Further, he testified that if the hypothetical worker needed to take breaks in excess of the normal break, there would be no jobs available in the national or regional economy. *Id.*

The medical records show that the plaintiff had her first seizure in January 2004. Filing No. 8, Admin. R. II at 281.  EEG results on March 17, 2004, were abnormal, showing the presence of "bifrontal independent slowing" that can be "the postictal residual of intense focal seizure activity in the frontal areas."  *Id.* at 408.  Following that seizure, she was prescribed Dilantin, went off the medication briefly and suffered another grand mal seizure shortly thereafter.  *Id.* at 281.  While on Dilantin, she continued to suffer monthly "spells" in which she would hear some humming lasting about thirty seconds and would not be able to talk for a while.  *Id.*

She suffered a grand mal seizure after running out of her medication and was brought to Box Butte General Hospital on May 20, 2006, in a postictal state.  *Id.*  In August of 2006, her treating physician, Joseph J. LoPresti, M.D., of West Nebraska Neuro-Diagnostics, noted that Weber suffered from weekly headaches involving seeing stars, nausea and numbness in her right hand.  *Id.*  Dr. LoPresti reported that he "felt that [Weber] had a seizure focus, probably left hemisphere with episodes of hearing music and

6

then difficulty speaking and probably these represented partial or complex partial seizures with secondary generalization with a probable left hemispheric focus," as well as migraines. *Id.* at 284. She was prescribed Dilantin and Topamax and was later weaned off Dilantin. *Id.* at 284-86. She continued to be treated by Dr. LoPresti's office for seizures throughout 2006 and 2007. *Id.* at 286-292. In August 2006, she complained of excessive daytime sleepiness and Dr. LoPresti ordered a sleep study. *Id.* at 284. In March 2007, she reported she had not suffered from any seizures since her previous visit, but complained of numbness and cramping in her hands and feet. *Id.* at 287. In June 2007, the plaintiff reported increased confusion and worsening headaches to Dr. LoPresti. *Id.* at 286. Dr. LoPresti prescribed a muscle relaxant and physical therapy for her neck to treat her headaches. *Id.*

In July 2007, Dr. LoPresti noted that numbness in the plaintiff's hands, dropping things, and headaches had "been going on for more than a year." *Id.* at 291. She was diagnosed with "moderate to severe bilateral carpal tunnel syndrome with both motor and sensory component affected, right greater than left. On the right side the amplitude was decreased so there is some axonal component as well as demyelinating component to the neuropathy." *Id.* at 291-92. Doctors' notes from March 2008 state that "[t]he patient complains of sleepiness all the time" and of "having a dull headache all the time and a migraine twice a week, which is more excruciating and are consequent with spots and double vision." *Id.*

Ms. Weber was treated for worsening knee pain in October of 2007. *Id.* at 390. On October 11, 2007, she presented at Scottsbluff Orthopaedic Associates, P.C., reporting pain in her left knee since a month earlier. *Id.* An MRI of her knee at that time showed a

"contusion or microfracture of the proximal tibia midline and extending toward the medial tibial plateau and deep to the tibial spines without discreet fracture line or displacement," and there were also "[f]indings compatible with partial posterior root tear, medial meniscus, with slight medial displacement of the meniscal body," "[m]ild tricompartment osteoarthritis," and "[s]mall joint effusion." *Id.* at 390.

She was examined by physician's assistants (PAs) Abbie Cross, PA-C, and Jerre Mount, PA, in connection with the knee problems. *Id.* at 394. Ms. Cross noted "[s]he is very difficult to exam because of her lack of motion and pain." *Id.* Records from May 2008 show that her complaints of knee pain date back to 1997 when she had an arthroscopy. *Id.* at 552. X-rays taken at in 1997 showed "significant arthritis of the medial and patella femoral compartments." *Id.*

On October 15, 2007, Ms. Weber met with Dr. Diane Gilles for treatment of her carpal tunnel syndrome. *Id.* at 396. Dr. Gilles noted that the plaintiff arrived at the office in a wheelchair, in part because her hands would go numb while she was using crutches. *Id.* Dr. Gilles also noted that the plaintiff had exhibited symptoms of carpal tunnel syndrome since June of 2006. *Id.*

The plaintiff underwent surgery for her carpal tunnel syndrome on November 12, 2007. *Id.* at 16. On November 20, 2007, the plaintiff had no complaints of pain and an improved range of motion in her fingers on both hands. *Id.* However, on April 24, 2008, Weber was referred for a neurosurgical consultation by Jerre Mount, PA, for numbness in her hands.[6]  *Id.* at 521. Records of the consultation show that the plaintiff reported that

---

[6]Jerre Mount, PA, is identified as Ms. Weber's primary care provider. *Id.* at 522. Records show that Ms. Mount works under the supervision of Dr. Gilles and John Ruffing, M.D. *Id.* at 308, 394, 466.

8

she initially felt better after the carpal tunnel surgery in November of 2007, but subsequently her symptoms returned. *Id.* A nerve conduction study on April 24, 2008, showed "electrodiagnostic evidence of bilateral median focal predominantly demyelinating mononeuropathies localizing to the wrist segment or carpal tunnel syndrome of mild severity." *Id*. at 531. An MRI of the cervical spine showed a "disk bulge eccentric to the left side at 6-7" and a "small disk protrusion off of the right-hand side." *Id.* at 521. She was diagnosed with cervical spondylosis, probable recurrent carpal tunnel syndrome, and metabolic syndrome and morbid obesity. *Id.* She underwent a second surgery for recurrent bilateral carpal tunnel syndrome on May 30, 2008. *Id.* at 555. Operative findings were:

> Marked scarring at the site of the left-sided carpal tunnel release with recurrent compression of the median nerve on the left. Severe scarring of the right median nerve with scar tissue encasing around the nerve and scar at the level of the flexor retinaculum recompressing the nerve and adhesion of the surface of the nerve to the surrounding muscle and ligamentous tissues.

*Id.* After the surgery, noting that she did not work, her surgeon, Dr. Watt, advised Ms. Weber to continue her current level of activities. *Id.* at 560. She was also treated for knee pain in May of 2008 by Timothy J. Friedlein, M.D. *Id.* at 561. His impression was "significant arthritis of the right knee." *Id.* He discussed the surgical option of a total knee arthroplasty, but advised against it because of her age and her size. *Id.*

She was treated in August 2008 for a known ventral hernia and lower back pain. X-rays at that time showed mild degenerative changes of the lumbar spine, most pronounced at L5-S1. *Id.* at 589. A CT scan showed "severe L5-S1 degenerative facet joint disease." *Id.* at 619.

9

In March 2008, Dr. LoPresti noted the plaintiff suffered from carpal tunnel syndrome, persistent dull headaches, recurring migraine headaches, persistent sleepiness, obesity, and a "high probability of sleep apnea. . . ." *Id.* at 449. He recommended a sleep study. *Id.* The study was performed on April 28, 2008, and showed "[m]oderate obstructive sleep apnea with severe hypoxemia during sleep." *Id.* at 577.

In April 2008, the plaintiff was seen at Sandhills Family Center and reported bilateral knee pain and stated that she had to sit down while fixing supper. *Id.* at 464. The physician's assistant, Jerre Mount, PA-C, was reluctant to prescribe anti–inflammatory medications and advised that aspirin would not be a good medication with Von Willebrand's disease. *Id.* The plaintiff was prescribed Ultram for pain. *Id.* The records also show that Ms. Weber was referred by Dr. LoPresti to the Sandhills Family Center "to get started on a disability program for her" and that the plaintiff was to meet with social services to "get disability application."[7] *Id.* at 466-68.

Records show the plaintiff has been prescribed numerous medications at various times, including Dilantin, Topamax, Lamictal, Tegretol, Fiorinal, Fioricet, verapramil, nitroglycerine, Ultram, and Soma. *Id.* at 628, 464, 288. In September 2008, the plaintiff was treated by neurologist Betty F. Ball, M.D., for worsening headaches. *Id.* at 628-30. Dr. Ball indicated that Weber reported that for the previous two years her headaches had "escalated to being essentially a constant phenomenon and are severe 2 or 3 times a week" and that the headaches were sometimes accompanied by a "small seizure" or

---

[7]Dr. LoPresti's records corroborate this. Dr. LoPresti's records show that in March of 2007, the plaintiff reported that she could not afford the seizure medication and Dr. LoPresti's notes indicate he advised that "this has been a good medicine for her and the switching process may involve having breakthrough seizures and that with a social worker we may be able to get her through the period where she has to make the full payment." *Id.* at 306.

"spell," which was characterized by "her just suddenly being unable to talk, i.e., make any noise at all, this may last for about 30 seconds and then her speech returns." *Id.* at 628. Afterward, Weber reported she was tired and her speech was slurred. *Id.* After a neurological exam, Dr. Ball found the plaintiff's history and exam were "consistent with a diagnosis of probable complicated migraine rather than the patient having a true seizure disorder" and she was treated for "complicated basilar migraine." *Id.* at 629. Dr. Ball's examination notes indicate that Weber was "able to rise to stand and ambulate without assistance with a normal gait pattern including walking on heels, toes, squatting and hopping on either foot" and that "[t]andem gait and tandem stance [were] within normal limits." *Id.* at 630.

Jerre Mount, PA, the plaintiff's treating physician's assistant, was asked to give an opinion on Ms. Weber's ability to do work-related activities on a regular and continuous basis. *Id.* at 634. The PA's opinion was that Weber could frequently lift up to 10 pounds and occasionally lift up to 20 pounds, occasionally carry up to 10 pounds; could sit for one hour; could stand for 15 to 20 minutes; and could walk 30 minutes with assistance. *Id.* at 635. In an eight-hour workday, the PA stated that Weber could sit for a total of five hours, stand for a total of one hour and walk for a total of two hours. *Id.* at 635. The PA elaborated that "the [patient complains of] pain with motion including ambulation," and "used a grocery cart to emulate." *Id.* at 635, 638. She estimated Weber could emulate approximately 150 feet without the use of a cane. *Id.* at 635. She based those findings on clinical evidence including X-rays and exams. *Id.* The PA also stated that the plaintiff was limited to occasional use of her hands for handling, fingering, feeling and pushing or pulling. *Id.* at 636. The PA explained that Weber was still having numbness of fingers and

lots of pain.  *Id.*  The record shows that the PA had been involved in Weber's medical care since 2006.  *See, e.g., id.* at 308.

> B.   ALJ's Findings

The ALJ found that on the date she was last insured, the plaintiff suffered from the following severe impairments: degenerative joint disease of the knees, obesity, degenerative joint disease of the cervical spine, and bilateral carpal tunnel syndrome status post release.  *Id.* at 11.  He found, based on a consulting psychologist's testimony, that the plaintiff did not have any severe mental disorder and found that the plaintiff had not established that her moderate obstructive sleep apnea was a severe impairment prior to September 30, 2007.

He further found that Weber did not have an impairment or combination of impairments that met or equaled the criteria of any of the listed impairments described in Appendix 1 of the Social Security Regulations, 20 C.F.R., Part 404, Subpart P, Appendix 1 ("the Listings").   He found the plaintiff did not have seizures when she was compliant with her medication.  *Id.* at 13.  He discussed Listing 1.00, which involves impairments of the muscloskeletal system.[8]  *Id.* at 14.  Stating that he had considered any additional and

---

[8]To be presumptively disabled under Section 1.02, a claimant must show:

Major dysfunction of a joint(s) (due to any cause):  Characterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s).  With:  A. Involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b; . . . .

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.02.  Inability to ambulate effectively means an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities.  *Id.*, § 100(B)(2)(b)(1).  "To ambulate effectively, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living.  They must have the ability to travel without companion assistance to and from a place of employment or school."  *Id.*, § 100(B)(2)(b)(2).

cumulative effects of obesity, he found that the evaluation of the plaintiff by Dr. Ball demonstrated that Weber could ambulate effectively.  *Id.*

He found Ms. Weber had the residual functional capacity ("RFC") to occasionally lift and/or carry twenty pounds, frequently lift and/or carry ten pounds, stand and/or walk for about two hours in an 8-hour workday (with normal breaks), sit for at least 6 hours in an 8-hour workday (with normal breaks), occasionally push/pull (including operation of hand or foot controls) twenty pounds, occasionally climb ramps/stairs, occasionally balance, stoop, kneel, crouch, or crawl, and was able to reach frequently overhead, and to frequently handle and finger, but could not  climb ladders/ropes/scaffolds and could not have any concentrated exposure to extreme cold, heat, wetness, humidity, noise, or vibrations, and no exposure to hazards.  *Id.* at 14-15.  Those findings roughly correspond to the residual functional capacity analysis by a consulting physician, A.R. Hohensee, M.D., who had reviewed Ms. Weber's medical records, except that with respect to "manipulative limitations," the consulting physician found Weber had limited ability for fingering (fine manipulation).  *Id.* at 265, 267.

In determining her residual functional capacity, the ALJ found that Weber's medically determinable impairments could reasonably be expected to cause the alleged symptoms, but that her testimony "concerning the intensity, persistence and limiting effects of these symptoms was not credible to the extent it was inconsistent with the [consulting physicians'] residual functional capacity assessment."   *Id.* at 16.  He noted that Weber could drive for short distances, could take care of personal needs, and could watch television and read the paper.  *Id.* at 16.  He discounted her testimony about migraines, noting that Ms. Weber testified at one point that she took medication when she had a

migraine and later stated that she does not take pain medication because of the bleeding disorder. *Id.* at 16.

Further, he noted that the plaintiff cared for her mother-in-law from 2002 until she moved into a nursing facility in July 2005, but that "the claimant is asserting that she suddenly became disabled on August 1, 2005 right after her mother-in-law went into a nursing home. However, the claimant still went out and found a part-time job. She did not apply for disability for 22 months after she stopped working that job." *Id.* at 16. He further noted that the plaintiff had not stopped smoking, did not exercise and had not lost weight. *Id.*

The ALJ rejected the limitations set out in the Medical Source Statements by Jerre Mount, PA, stating that "[a] physician's assistant is not an acceptable medical source." *Id.* at 17. He further noted "this is the only opinion by any treating medical source and even accepted at face value indicates that the claimant could work at sedentary type jobs." *Id.* Based on the plaintiff's age, education, work experience, and RFC, the ALJ found there were jobs that existed in significant numbers in the national economy that the claimant could have performed. *Id.* at 18.

On appeal, the plaintiff argues that the ALJ erred in finding that she did not have an impairment that meets or equals the Listings. She argues that the ALJ's finding that Weber could ambulate effectively is not based on substantial evidence. The plaintiff also assigns error to the ALJ's RFC determination because there is substantial evidence to counter the ALJ's finding that the plaintiff could handle/finger on a frequent basis.

The Commissioner argues that the ALJ's finding is supported by substantial evidence and the plaintiff has failed to prove she was disabled prior to September 30, 2007.

**II.  Law**

In an appeal of the denial of Social Security disability benefits, this court "must review the entire administrative record to 'determine whether the ALJ's findings are supported by substantial evidence on the record as a whole'" and "'may not reverse . . . merely because substantial evidence would support a contrary outcome.'" *Johnson v. Astrue,* 628 F.3d 991, 992 (8th Cir. 2011) *(quoting Dolph v. Barnhart,* 308 F.3d 876, 877 (8th Cir. 2002).  Substantial evidence is that which a reasonable mind might accept as adequate to support a conclusion.  *Id.* (*quoting Brown v. Astrue,* 611 F.3d 941, 951 (8th Cir. 2010)).  The court's review "is more than a search of the record for evidence supporting the [Commissioner's] findings," *Hunt v. Massanari,* 250 F.3d 622, 623 (8th Cir. 2001) (internal quotations and citations omitted), and "requires a scrutinizing analysis, not merely a 'rubber stamp' of the [Commissioner's] action." *Cooper v. Sullivan,* 919 F.2d 1317, 1320 (8th Cir. 1990).  The court must consider evidence that detracts from the Commissioner's decision in addition to evidence that supports it.  *Finch v. Astrue,* 547 F.3d 933, 935 (8th Cir. 2008).

The court must also determine whether the Commissioner's decision "is based on legal error." *Lowe v. Apfel,* 226 F.3d 969, 971 (8th Cir. 2000).  The court owes no deference to the Commissioner's legal conclusions.  *See Juszczyk v. Astrue,* 542 F.3d 626, 633 (8th Cir. 2008).

A disability is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505. A claimant is disabled when the claimant is "not only unable to do his previous work but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists in [significant numbers in] the national economy . . . either in the region in which such individual lives or in several regions of the country." 42 U.S.C. § 432(d)(2)(A).

It is the ALJ's duty to investigate the facts and develop the arguments both for and against granting benefits. *Sims v. Apfel,* 530 U.S. 103, 111 (2000) (noting that "Social Security proceedings are inquisitorial rather than adversarial."). When assessing the credibility of a claimant's subjective allegations, the ALJ must consider the claimant's prior work history; daily activities; duration; frequency and intensity of pain; dosage; effectiveness and side effects of medication; precipitating and aggravating factors; and functional restrictions. *Tate v. Apfel,* 167 F.3d 1191, 1197 (8th Cir. 1999) (applying analysis mandated by *Polaski v. Heckler,* 739 F.2d 1320, 1322 (8th Cir. 1997)). "An ALJ may discount a claimant's subjective complaints only if there are inconsistencies in the record as a whole." *Jackson v. Apfel,* 162 F.3d 533, 538 (8th Cir. 1998) (quoting *Porch v. Chater,* 115 F.3d 567, 572 (8th Cir. 1997)). A claimant may have disabling pain and still be able to perform some daily home activities. *Burress v. Apfel,* 141 F.3d 875, 881 (8th Cir. 1998) (the ability to do activities such as light housework and visiting with friends provides little or no support for the finding that a claimant can perform full-time competitive work.").

A "strong indication" of the credibility of a claimant's statements is the consistency of the claimant's various statements and the consistency between the statements and the other evidence in the record. Soc. Sec. Rul. 96-7p, 1996 WL 374186 at *5 (July 2, 1996) (Policy Interpretation Ruling Titles II and XVI: Evaluation of Symptoms in Disability Claims: Assessing the Credibility of an Individual's Statements). The ALJ must consider such factors as:

- The degree to which the individual's statements are consistent with the medical signs and laboratory findings and other information provided by medical sources, including information about medical history and treatment.

- The consistency of the individual's own statements. The adjudicator must compare statements made by the individual in connection with his or her claim for disability benefits with statements he or she made under other circumstances, when such information is in the case record. Especially important are statements made to treating or examining medical sources and to the "other sources" defined in 20 C.F.R. 404.1513(e). . . . However, the lack of consistency between an individual's statements and other statements that he or she has made at other times does not necessarily mean that the individual's statements are not credible. Symptoms may vary in their intensity, persistence, and functional effects, or may worsen or improve with time, and this may explain why the individual does not always allege the same intensity, persistence, or functional effects of his or her symptoms. Therefore, the adjudicator will need to review the case record to determine whether there are any explanations for any variations in the individual's statements about symptoms and their effects.

- The consistency of the individual's statements with other information in the case record, including reports and observations by other persons concerning the individual's daily activities, behavior, and efforts to work. This includes any observations recorded by SSA employees in interviews and observations recorded by the adjudicator in administrative proceedings.

*Id.* at *5.

Under the Listings of presumptively disabling disabilities involving the musculoskeletal system, an individual is considered disabled if he or she "cannot ambulate effectively on a sustained basis for any reason and that inability to ambulate effectively or the inability to perform fine and gross movements effectively has lasted, or is expected to

last, at least 12 months." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.00.  The Listings provide that a major dysfunction of a joint is characterized by gross anatomical deformity and chronic joint pain and stiffness with signs of limitations of motion or other abnormal motion of the affected joint(s).  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.02.  That is, involvement of one major peripheral weight-bearing joint (i.e., knee) resulting in the inability to ambulate effectively, or the involvement of one major peripheral joint in each upper extremity (i.e., wrist-hand), resulting in the inability to ambulate effectively shall amount to a disability.  *Id.*

The inability to ambulate effectively means "an extreme limitation of the ability to walk, i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities." *Id.* at 1.00(2)(b)(1).  Moreover, to ambulate effectively, "individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out the activities of daily living." *Id.* at 1.00(2)(b)(2).  Examples of ineffective ambulation include "the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation . . . and the inability to climb a few steps at a reasonable pace with the use of a single hand rail." *Id.*  Also, "[t]he ability to walk independently about one's home without the use of assistive devices does not, in and of itself, constitute effective ambulation." *Id.*

In addition, adjudicators "must consider any additional and cumulative effects" that obesity may have on an individual's musculoskeletal impairments.  *Id.* at § 1.00(Q).  Indeed, "obesity is a medically determinable impairment that is often associated with disturbance of the musculoskeletal system, and disturbance of this system can be a major cause of disability in individuals with obesity." *Id.*  "The combined effects of obesity with

musculoskeletal impairments can be greater than the effects of each of the impairments considered separately." *Id.*

Residual functional capacity ("RFC") is defined as the claimant's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis, i.e., eight hours a day, five days a week, or an equivalent work schedule. Soc. Sec. Rul. 96-8p, 1996 WL 374184, at *2 (July 2, 1996) (Policy Interpretation Ruling Titles II and XVI: Assessing Residual Functional Capacity in Initial Claims).  RFC is what an individual can still do despite his/her impairments and the resulting limitations. *Id.* at 2. Although the issue of an individual's RFC is a medical question, *Nevland v. Apfel,* 204 F.3d 853, 858 (8th Cir. 2000), RFC is not based solely on "medical" evidence. *See McKinney v. Apfel,* 228 F.3d 860, 863 (8th Cir. 2000) (holding that the Commissioner must determine a claimant's RFC based on all of the relevant evidence, including medical records, observations of treating physicians and others, and an individual's own description of the limitations).  To reach conclusions about an individual's impairments to make a disability determination, the Commissioner must "consider all the available evidence in the individual's case record, including objective medical evidence; other evidence from medical sources, including their opinions; statements by the individual and others about the impairment(s) and how it affects the individual's functioning; information from other 'non-medical sources' and decisions by other governmental and nongovernmental agencies.  Sec. Rul. 06-03p, 2006 WL 2329939 at *1 (Aug. 9, 2006) (Policy Interpretation Ruling Titles II and XVI: Considering Opinions and Other Evidence from Sources Who Are Not "Acceptable Medical Sources" in Disability Claims).  The term "medical sources" refers to both "acceptable medical sources" and other healthcare providers who are not

"acceptable medical sources."  "Acceptable medical sources" are licensed physicians, licensed or certified psychologists, licensed optometrists, bassist podiatrists, and qualified speech language pathologists for speech or language impairments.  *Id.*  Other medical sources are nurse practitioners, physician assistants, licensed clinical social workers, naturopaths, chiropractors, audiologists, and therapists.  *Id.*  The distinction between "acceptable medical sources" and medical sources who are not "acceptable medical sources" is necessary with respect to establishing the existence of an impairment, evaluating medical opinions, and determining who can be considered a treating source. *Id.*  Information from these "other sources" cannot establish the existence of a medically determinable impairment.  *Id.* (noting that there must be evidence from an "acceptable medical source" for this purpose).  However, "information from such 'other sources' may be based on special knowledge of the individual and may provide insight into the severity of the impairment(s) and how it affects the individual's ability to function."  *Id.*  If a treating source's medical opinion about the nature and severity of the claimant's impairments is well-supported by medical evidence and is not inconsistent with other substantial evidence in the case, the treating source opinion is entitled to controlling weight.  20 C.F.R. § 416.927(d)(2).

The regulations define "medical opinions" as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [the claimant's] impairments."  20 C.F.R. § 416.927(a)(2).  However, Social Security regulations "do not explicitly address how to consider relevant opinions and other evidence from 'other sources' listed in 20 C.F.R. §§ 404.1513(d) and 416.913(d)."  Soc. Sec. Rul. 06-03p, 2006 WL 2329939 at *3 (noting that "[w]ith the growth of managed health

care in recent years and the emphasis on containing medical costs, medical sources who are not 'acceptable medical sources,' such as nurse practitioners, physician assistants, and licensed clinical social workers, have increasingly assumed a greater percentage of the treatment and evaluation functions previously handled primarily by physicians and psychologists"). The Commissioner clarified that the opinions "of these medical sources, who are not technically deemed 'acceptable medical sources' under [the commissioner's] rules, are important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file." *Id.*

The weight to which such evidence may be entitled will vary according to the particular facts of the case, the source of the opinion, including that source's qualifications, the issue that the opinion is about, and many other factors, including the how long the source has known and how frequently the source has seen the individual; how consistent the opinion is with other evidence; the degree to which the source presents relevant evidence to support an opinion; how well the source explains the opinion; whether the source has a specialty or area of expertise related individual's impairments. *Id.; see also Shontos v. Barnhart*, 328 F.3d 418, 426 (8th Cir.2003) (giving treating source status to the group of medical professionals, including therapists and nurse practitioners who worked with claimant's psychologist, where the treatment center used a team approach). Even though a nurse practitioner or physician's assistant is not entitled to treating source weight, his or her opinion is entitled to consideration as other medical evidence in the record. *Tindell v. Barnhart*, 444 F.3d 1002, 1005 (8th Cir. 2006). However, "depending on the particular facts in a case, and after applying the factors for weighing opinion evidence, an opinion from a medical source who is not an 'acceptable medical source' may outweigh the

opinion of an 'acceptable medical source,' including the medical opinion of a treating source." Soc. Sec. Rul. 06-03p, 2006 WL 2329939 at *5.

In determining residual functional capacity, a hypothetical question posed to a vocational expert must precisely set out all the claimant's impairments that are supported by the evidence. *Pickney v. Chater,* 96 F.3d 294, 297 (8th Cir. 1996). Furthermore, a hypothetical question posed to a vocational expert must capture the concrete consequences of claimant's deficiencies. *Id.* Testimony elicited by hypothetical questions that do not relate with precision to all of claimant's impairments cannot constitute substantial evidence to support the Secretary's decision. *Id.*

## II. DISCUSSION

The court finds that the ALJ erred in discounting Ms. Weber's subjective complaints of pain and other limitations, particularly with respect to her headaches and limited mobility. Although the ALJ outlined the *Polaski* factors, the record shows that he did not give proper consideration to those factors. The record contains objective medical evidence that supports Weber's subjective complaints. Ms. Weber has a long-standing history of debilitating headaches and knee and back pain. There is no inconsistency between the plaintiff's testimony and medical and other evidence of record. Ms. Weber's purportedly contradictory statements regarding her need for medication are not inconsistent. Her testimony regarding taking pain pills and lying in a dark room when suffering from migraine headaches involves the period of time prior to the point at which she was told to avoid certain medications. Significantly, there is no evidence with respect to the nature of the pain medications that Ms. Weber testified she had taken. The timing of the plaintiff's application is not suspect in that the record shows that her treating physician and clinic social workers encouraged her to apply for disability benefits. Nor can the court assign any

particular significance to the fact that the plaintiff cared for her mother-in-law without more specific evidence of what was entailed.

Further, Ms. Weber's testimony with respect to her daily activities is consistent with the objective medical evidence.  The record shows that the plaintiff has consistently complained of, and sought medical treatment for, disabling pain and lack of mobility in connection with headaches, knee pain and back pain.  She has undergone numerous objective procedures including X-rays, CT scans and MRIs that substantiate her medical conditions.  In short, the ALJ had no reason to disbelieve the plaintiff's testimony concerning the severity of her subjective complaints, all of which were substantiated by objective evidence.

The ALJ further erred in failing to find that the plaintiff's recurrent migraine headaches amount to a severe impairment and in failing to consider the effect of her numerous severe impairments in combination.  Also, the ALJ did not address the cumulative and additional effects the plaintiff's obesity has on her other afflictions.

The ALJ's finding that Ms. Weber did not have sleep apnea before the relevant date is not supported by the evidence.  Although she was not formally diagnosed with sleep apnea until she underwent a sleep study in 2008, Dr. LoPresti's records indicate that he suspected sleep apnea in 2006.  The diagnosis was based on symptoms that predated the date the plaintiff was last insured, and the sleep study provided objective confirmation of the diagnosis.  There is substantial evidence in the record that Weber suffered from disabling knee pain, disabling back pain, seizures, excessive sleepiness, and debilitating migraines long before the relevant date.

An evaluation conducted by Dr. Friedland, who treated the plaintiff for her knee pain, speaks to the plaintiff's ability to perform daily activities on a sustained basis.  Dr. Friedland

noted that the plaintiff had significant arthritis in her right knee and that her knee pain increased with ambulation.  Although the plaintiff expressed interest in surgical repair of her right knee, Dr. Friedland discouraged it because of her age and obesity.  He declined to recommend surgery, not because Weber didn't need it, but because she was a poor candidate due to her weight.

The ALJ committed an error of law when he afforded no weight to the assessment of limitations by Ms. Weber's treating PA.  Social Security Ruling 06.03P clearly provides that the opinion of a treating PA or nurse practitioner can be credited and may be entitled to more weight than the opinion of an "accepted medical source."  The PA's assessment involved impairment severity and functional effects, not the existence of a medical impairment, a diagnosis or prognosis.  Under Eighth Circuit precedent, the opinion of a PA may be afforded controlling weight if the PA is operating as part of a treatment team.  The record shows, PA Mount had a longstanding treatment relationship with the plaintiff, operated as part of a healthcare team, and was closely supervised by physicians.  Her opinion should have been given more weight than that of a consulting physician, who never examined the patient.

Without affording controlling weight to the opinion of the consulting physician, there is not sufficient evidence in the record to support the ALJ's RFC finding.  The ALJ compounded the error by failing to include all of the impairments that were supported by the record in the hypothetical question he posed to the vocational expert.  Weber's recurrent severe basilar migraines and complaints of daytime sleepiness are fully supported by the record.  The vocational expert testified that there would be no jobs in the national economy for a person of Weber's age, education, and abilities if she had to take breaks or had absences in excess of the norm.  Further, there is absolutely no evidence

in the record that Weber could perform tasks involving frequent fingering.  There is nothing in the record to indicate that the plaintiff had the ability to handle/finger items frequently during the relevant period.  Even the consulting physician testified that her abilities to perform that function were limited.  Objective evidence, including surgical reports, support Ms. Weber's contention that she often experiences pain, tingling, and numbness and drops things.  Again, the vocational expert testified that there were no jobs in the national economy for a person with those impairments.

The court is also inclined to find error in the ALJ's determination that Weber did not have an impairment or combination of impairments that met or equaled the Listings, but need not reach that issue in light of its other findings.  Ms Weber testified that she cannot walk more than fifty feet unaccompanied; that she does not qualify for public transportation in which the city she lives; and that she cannot walk up stairs, even just to go to sleep.  Such deficiencies are expressly identified as examples of the inability to ambulate effectively.  The plaintiff's testimony in this regard is fully corroborated by medical evidence.

This case is one where the combined effects of obesity with musculoskeletal impairments can be greater than the effects of each of the impairments considered separately.  Not only is plaintiff's obesity likely a cause of her inability to ambulate effectively, it also precludes remedial treatments that would allow her to improve her ambulation.  The ALJ's reliance on Dr. Ball's opinion for the conclusion that Weber could ambulate effectively is misplaced in the face of substantial evidence to the contrary.

Based on all the relevant evidence, including the plaintiff's testimony describing her own limitations, the medical records, and the observations of treating physicians and others, the court finds the ALJ's determination regarding plaintiff's RFC is not based on

substantial evidence.  There is no question that the plaintiff cannot return to her former work, and the Commissioner did not sustain the burden to show that there are other jobs in the regional or national economy that the plaintiff can perform.

"[W]here the medical evidence in the record overwhelmingly supports a finding of disability, remand is unnecessary."  *Gavin v. Heckler*, 811 F.2d 1195, 1201 (8th Cir. 1987); *Thompson v. Sullivan,* 957 F.2d 611, 614 (8th Cir. 1992).  The court determines that the record overwhelmingly supports a finding of disability.  Remand to take additional evidence in this case would only delay the receipt of benefits to which the plaintiff is entitled. Accordingly, the court finds the decision of the ALJ should be reversed and this action remanded for an award of benefits.

IT IS ORDERED:

1.  The decision of the Commissioner is reversed.

2.  This action is remanded to the Commissioner with instructions to award benefits.

3.  The plaintiff shall have 14 days from the date of this order to file a motion and brief with appropriate documentation requesting attorney fees in this case.  Defendant shall have 14 days thereafter to respond.

DATED this 28th day of March, 2012.

BY THE COURT:

s/ Joseph F. Bataillon
United States District Judge